Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL X

| OSCAR GONZÁLEZ RIVERA<br><br>Recurrido<br>V.<br><br>JUNTA DE DIRECTORES CONDOMINIO AMAPOLA 14; CONSEJO DE TITULARES CONDOMINIO AMAPOLA 14; MOMENTUM MANAGEMENT & REALTY p/c MARIA ISABEL SEPULVEDA; JOSE M. SILVERMAN, LOURDES MARINA CARRASQUILLO MERCADO y SOCIEDAD LEGAL DE GANANCIALES et als.<br><br>Recurrente | TA2026RA00252 | *Revisión Administrativa* procedente del Departamento de Asuntos del Consumidor (DACO)<br><br>Caso Núm. CSAN20250021207<br><br>Sobre:<br>LEY DE CONDOMINIOS DE PUERTO RICO, LEY NÚM. 129 DE 16 D AGOSTO DE 2020, SEGÚN ENMENDADA |
| OSCAR GONZÁLEZ RIVERA<br><br>Recurrido<br>V.<br>JUNTA DE DIRECTORES CONDOMINIO AMAPOLA 14; CONSEJO DE TITULARES CONDOMINIO AMAPOLA 14; MOMENTUM MANAGEMENT & REALTY p/c MARIA ISABEL SEPULVEDA; JOSE M. SILVERMAN, LOURDES MARINA CARRASQUILLO MERCADO y SOCIEDAD LEGAL DE GANANCIALES et als.<br><br>Recurrente | TA2026RA00257 | *Revisión Administrativa* procedente del Departamento de Asuntos del Consumidor (DACO)<br><br>Caso Núm. CSAN20250021207<br><br>Sobre:<br>LEY DE CONDOMINIOS DE PUERTO RICO, LEY NÚM. 129 DE 16 D AGOSTO DE 2020, SEGÚN ENMENDADA |

Panel integrado por su presidenta, la Jueza Grana Martínez, el Juez Ronda Del Toro y la Jueza Lotti Rodríguez

*Grana Martínez, jueza ponente*

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de junio de 2026.

Comparece la Junta de Directores de Condominio Amapola #14 (Junta de Directores) y Lourdes Marina Carrasquillo Mercado (señora Carrasquillo Mercado) (en conjunto, recurrentes) mediante recurso de *revisión judicial* presentado el 15 y 18 de mayo de 2026. Estos nos solicitan que dejemos sin efecto la *Resolución Sumaria* emitida por el Departamento de Asuntos del Consumidor (DACo) el 16 de marzo de 2026. Mediante el referido dictamen, el foro primario declaró "Ha Lugar" la *Querella* presentada por Oscar González Rivera (en adelante, recurrido o señor González Rivera).

El 19 de mayo de 2026, emitimos una *Resolución* en cual consolidamos los recursos TA2026RA00252 y TA2026RA00257. Dado a que, ambos recursos solicitan la revisión de la misma determinación administrativa, ejercimos nuestro poder de consolidación, conforme a la Regla 80.1 del Reglamento del Tribunal de Apelación, 4 LPRA Ap. XXII-B.[1]

Por los fundamentos que expondremos a continuación, se revoca la *Resolución* recurrida.

**I.**

Los hechos que traen la controversia ante nos, comienzan con la constitución del Condominio Amapola 14 mediante la Escritura Matriz Número 173 (en adelante, escritura matriz) en el año 1974.[2] El señor González Rivera advino titular del apartamento 202 ubicado en el Condominio Amapola 14 mediante Escritura de Compraventa Número 231 de 31 de diciembre de 2002.[3] El 1 de marzo de 2007, la Junta de Directores circuló un memorial a los titulares en el cual se informó la posibilidad de aprobar la venta del salón de reuniones, con el fin de cubrir los costos para obras de reparación y mantenimiento.[4] Así las

---

[1] Para efectos de nombrar los documentos en el apéndice se utilizará los provistos en el recurso TA2026RA00252.
[2] Entrada #1, Anejo 1, del Sistema Unificado de Manejo y Administración de Casos de Primera Instancia (SUMAC PI) del caso TA2026RA00252, págs. 38-196.
[3] Íd., Anejo 2, págs. 186-196.
[4] Íd., Anejo 6, págs. 206-208.

cosas, el 15 de marzo de 2007, la Junta de Directores convocó una asamblea extraordinaria para el 26 de marzo de 2007, con el fin de atender, entre otros asuntos, la aprobación de la venta del salón de reuniones.[5] Celebrada la referida asamblea, se aprobó por unanimidad la siguiente moción sobre el apartamento 103: "Que se venda o se permute el apartamento para hacer arreglo estructural y pintura del edificio siempre qu[e] el valor sea el mismo".[6]

Así las cosas, según alegado por la Junta de Directores el 4 de febrero de 2009, se otorgó la Escritura Número 4 de Dación en Pago por el Lcdo. Villanueva para transferir el título del salón de reuniones o meeting room a nombre de José Miguel Silverman, presidente de Silverman Painting, a su esposa Lourdes Marina Carrasquillo Mercado, y la Sociedad Legal de Gananciales compuesta por ambos. Este instrumento público no logró entrada al Registro de la Propiedad.[7]

Posteriormente, el 10 de noviembre de 2022, se convocó una asamblea extraordinaria a celebrarse el 29 de noviembre de 2022, la cual incluyó como tema la "Constitución Apartamento 103 y Estacionamiento #2".[8] En esa asamblea, se consignó que se requería el voto unánime de los titulares por lo que tenían que notificar a los ausentes de la reunión.[9] Además, se indicó que el proceso de venta del salón de reuniones aprobado en el 2009 no se completó ante el Registro de la Propiedad, por lo que se llevaría a cabo la asamblea para, entre otras, ratificar el convertir el apartamento 103 y el estacionamiento 2-A, de comunal a privativo.[10] Según el señor González Rivera, este nunca fue notificado de dicha asamblea.[11]

El 12 de diciembre de 2023, la Junta de Directores remitió comunicación a los ausentes a dicha asamblea extraordinaria, en la

---

[5] Íd., Anejo 7, págs. 209-210.
[6] Íd., Anejo 8, pág. 213.
[7] Véase determinación de hecho número 10 de la Resolución Sumaria de DACo
[8] Íd., Anejo 9, págs. 214-215.
[9] Íd., Anejo 10, págs. 216-219.
[10] Íd.
[11] Véase, Entrada #1, *Querella* de SUMAC PI.

cual informó que se extendía un plazo a vencer el 20 de enero de 2023 para notificar las discrepancias con el acuerdo aprobado.[12] El 7 de enero de 2023, el señor González Rivera remitió una carta a la Junta de Directores y al agente administrador, en la cual indicó que todo lo actuado en el 2009 sobre el apartamento 103 es nulo desde su inicio.[13] Sostuvo que procedía la restitución del salón de reuniones a su estado original, por estar dicho elemento sujeto a indivisión forzosa por los titulares.[14] Además, argumentó que tal acto contraviene la Ley de Condominios 2020, sus antecesoras leyes y la escritura matriz del condominio. Indicó que la escritura matriz describe en su primer piso de cuatro (4) apartamentos residenciales y *"one meeting room"*, por lo que, es un elemento común descrito como *"necessary for the adequate use and enjoyment of the family unit…"*[15]

El 20 de marzo de 2023, la representación legal de la Junta de Directores respondió la carta del recurrido, en la cual sostuvo que dicha enajenación fue legal, dado a que fue aprobada de forma válida, legal y unánime en la asamblea celebrada el 26 de marzo de 2007.[16] Sostuvo que desde el año 2009, el condominio fue objeto del proceso formal y efectivo ante el Registro de la Propiedad sobre la enmienda a la Escritura Matriz para adaptarla a lo aprobado por el Consejo de Titulares en torno a la conversión del apartamento 103 a uno privativo.

Luego de varias misivas entre las partes, el recurrido presentó una *Demanda y Petición de Interdicto Preliminar y Permanente Juramentada* bajo el caso CA2023CV02235. De ese caso, el Tribunal de Primera Instancia dictó *Sentencia* en la cual desestimó la demanda por falta de jurisdicción sobre la materia. Ante ello, el recurrido radicó una *Apelación,* la cual este Tribunal confirmó la *Sentencia* emitida por el Tribunal de Primera Instancia. En dicha sentencia preciso que el

---

[12] Íd., Anejo 11, pág. 220
[13] Íd., Anejo 12, págs. 221-222.
[14] Íd.
[15] Íd.
[16] Íd., Anejo 14, pág. 224-225.

reclamo del Sr. Gonzalez Rivera era sobre un elemento común del Condominio y no sobre un elemento individual y propietario. También puntualizó que la dación en pago del salón de reuniones o meeting room fue una decisión unánime entre los titulares del consorcio presentes en la reunión, quienes para disminuir los gastos del mantenimiento optaron por vender dicho salón [17]

El 8 de enero de 2025, el señor González Rivera presentó la *Querella* de epígrafe ante el DACo.[18] Luego de varios trámites procesales, el 8 de mayo de 2025, la Junta de Directores presentó ante el DACo una *Moción de Desestimación.*[19] El 22 de mayo de 2025, el recurrido presentó su *Oposición a Solicitud de Desestimación y Solicitud de Resolución Sumaria.*[20] El 6 de marzo de 2026, la señora Carrasquillo Mercado radicó *Solicitud de Desestimación de Querella,* en la cual argumentó que la querella estaba prescrita, que el recurrido no acreditó cumplir los requisitos legales para radicarla, y que el apartamento sobre el cual versa la querella es un bien procomunal, no elemento común necesario, lo cual derrota el planteamiento de nulidad de la dación en pago.[21] El 9 de marzo de 2026, la Junta de Directores se unió a la solicitud de desestimación de la señora Carrasquillo Mercado, y reiteró su solicitud de desestimación ya presentada.[22]

Finalmente, el DACo emitió una *Resolución Sumaria* mediante la cual determinó que los actos sobre constituir el apartamento 103 como uno privativo son nulos *ab initio,* por lo cual el recurrido tiene legitimación para presentar la querella por no encontrarse prescrita.[23] Explicó que, en la escritura matriz quedó establecido que el salón de reuniones es un elemento común general necesario. Por tanto, quedó

---

[17] Véase, *Oscar Rivera v. Consejo de Titulares Condominio Amapola 14*, KLAN202400754.
[18] Entrada #1 de SUMAC PI.
[19] Entrada #7, Apéndice 6 de SUMAC PI.
[20] Entrada #8, Apéndice 7 de SUMAC PI.
[21] Entrada #16, Apéndice 15 de SUMAC PI.
[22] Entrada #17, Apéndice 16 de SUMAC PI.
[23] Entrada #18, Apéndice 17 de SUMAC PI.

plasmado el carácter de indivisibilidad forzosa de todos los elementos comunes del condominio, por lo que no podrán destinarse a otro uso que no sea el asignado en su origen. En adición, sostuvo que, la cláusula QUINTA dispone que los elementos comunes y/o restringidos permanecerán indivisos y no serán objeto de una acción para la división de la copropiedad. A esos efectos, en la escritura matriz no se creó ni nunca quedó constituido el salón de reuniones como un apartamento para uso privado, como el resto de los apartamentos en el Condominio Amapola 14.

Además, sostuvo que aun cuando los recurrentes han insistido en que el señor González Rivera no tiene legitimación para presentar la *Querella* por no haber asistido a las asambleas extraordinarias del 26 de marzo de 2007 y del 29 de noviembre de 2022, lo cierto es que, pese a que, la Junta de Directores son los que poseen todos los documentos bajo su poder, estos no presentaron prueba alguna sobre que el señor González Rivera fue debidamente convocado por las asambleas extraordinarias en cuestión. Por tanto, DACo emitió las siguientes ordenes:

> Se ORDENA a la parte querellada, Consejo de Titulares del Condominio Amapola 14 y a su Junta de Directores desalojar a los residentes o personas que actualmente ocupan y utilizan físicamente el salón de reuniones del condominio identificado bajo el número 103 como propiedad residencial privada y llevar a su estado original dicho salón para el uso y aprovechamiento de todos los titulares del condominio, por tratarse de un elemento común general necesario, dentro del término de sesenta (60) días calendario, contados a partir de la fecha de archivo en autos de la notificación de la presente Orden.

> Se ORDENA a la parte querellada, José Miguel Silverman, su esposa Lourdes Marina Carrasquillo Mercado y la Sociedad Legal de Gananciales compuesta entre ambos a hacer entrega de la posesión física del salón de reuniones del condominio identificado bajo el número 103 y librarlo de todo objeto que no le corresponda, dentro del término de sesenta (60) días calendario, contados a partir de la fecha de archivo en autos de la notificación de la presente Orden.

> Se ORDENA a la parte querellada, Consejo de Titulares del Condominio Amapola 14 y su Junta de Directores el pago de quinientos dólares ($500.00) a favor de la parte querellante, Oscar González Rivera, por concepto de temeridad, el cual deberá hacerse dentro del término de treinta (30) días

calendario, contados a partir de la fecha de archivo en auto de la notificación de la presente Orden.[24]

Se ordena el CIERRE y ARCHIVO de la querella de epígrafe.

Luego de evaluar ambas posiciones y la prueba presentada, el DACo emitió las siguientes determinaciones de hechos:

## DETERMINACIONES DE HECHOS

1. La parte querellante, Oscar González Rivera, es titular del apartamento 202 del Condominio Amapola 14, en virtud de la escritura núm. 231 sobre compraventa, otorgada el 31 de diciembre de 2002, en San Juan, Puerto Rico, ante el Notario Rafael A. Ojeda Diez.

2. El Condominio Amapola 14 se encuentra sometido al régimen de propiedad horizontal, conforme la escritura núm. 173, otorgada el 27 de diciembre de 1974(sic), en San Juan, Puerto Rico, ante el Notario Ángel Álvarez Pérez

3. La escritura matriz del Condominio Amapola I5, en su cláusula TERCERA dispone lo siguiente:

   *That the said project consists of a Basement, a Lobby Floor and Twelve Upper Floors, each comprising five individual and residential apartments, except the first floor which contains four residential apartments and on meeting room. The twelve floors above the lobby floor are all capable of individual utilization on account of having their own exit to a common and/or restricted area of the project. Each apartment (hereinafter called a "family unit") and the owner thereof will obtain a particular and exclusive property right to the family unit and shall also acquire an undivided interest in the general and/or restricted common areas and facilities of the project, as listed herein after in this deed, necessary for the adequate use and enjoyment of the family unit, all in accordance with the Horizontal Property Act of Puerto Rico, Act Number One Hundred Four (104) of June twenty five, nineteen hundred fifty eight as amended.*

4. La escritura matriz del Condominio Amapola 14, en su cláusula QUINTA, inciso (2), sub inciso (b), dispone lo siguiente:

   *General Common Areas and/or Restricted facilities of the Property: The general common elements and/or restricted facilities of the property which is the subject of this deed, known as AMAPOLA 14 CONDOMINIUM are as follows:*

   *(a) [. . .]*

   *(b) In general, the foundation, main or bearing walls, roots, halls, lobby, meeting room, stairways and the entrances and exits to the building.*

   *[. . .].*

---

[24] Íd., pág. 14.

*All of the common elements and/or restricted facilities shall remain undivided and shall not be subject of an action for division of the co-ownership. Furthermore each co-owner may use the elements used in common in accordance mwith the purpose for which they are intended, without hindering or encroaching upon the lawful rights of the co-owners.*

5. La escritura matriz del Condominio Amapola 14, en su cláusula VEINTISEIS establece lo siguiente:

*The measures of the family units include all of the outside block partition walls and one half of the interior partitions but excluding bearing walls. Each and every one of the Apartments are hereinafter described as follows:*

*APARTMENT ONE HUNDRED THREE (103) Also known as meeting room: HORIZONTAL PROPERTY-URBAN: Residential Apartment in regular shape at the First Floor of Amapola 14 Condominium, located at Cangrejo Arriba Ward, of the Municipality of Carolina, Puerto Rico. Said meeting room has an area of approximately Five Hundred Eighty Six point five one feet (581.51 Ft.) equivalent to fifty four point fifty one square meters(54.51sq. mts.) and its boundaries are as follows: at the west, a block wall of twety five point five eight feet (25.58 ft.) equivalent to seven point eighty meters (7.80 mts.) consisting of the Western boundary of the meeting room, walk-in closet, and bathroom wall; at the north, in twenty one point eighty three feet (21.83 ft.) equivalent to six point six five meters (6.65 mts.) consisting on a terrace and window wall overlooking the ocean; on the east, a block wall of twenty eight point eightu three feet (28.83ft) equivalent to eight point seven nine meters (8.79 mts.) consisting of the eastern boundary*
*of the terrace and meeting rooms; and at the south, in twenty one point eighty three feet (21.83 ft.) equivalent to six point six five meters (6.65 mts.) consisting of the southern boundary or the meeting room, the meeting room entrance.*

*This Apartment or Meeting Room comprises: Front Covered Terrace and Comunal area for the meeting room.*

6. El salón de reuniones, identificado como el apartamento número 103, conforme la escritura matriz del Condominio Amapola 14 es un elemento común general y necesario.

7. El 15 de marzo de 2007, la Junta de Directores del Condominio Amapola 14 circuló a los titulares a una asamblea extraordinaria, a celebrarse el 26 o 28 de marzo de 2007, para aprobar la venta del salón de reuniones del condominio: esto para enfrentar los costos para obras de reparación y mantenimiento, destacando la pintura del edificio los elevadores.

8. La parte querellante no recibió la convocatoria para la asamblea del 26 de marzo de 2007.

9. El 26 de marzo de 2007 el Consejo de Titulares del Condominio Amapola 14 celebró la" asamblea extraordinaria en donde todos los titulares presentes aprobaron unánimemente la venta del salón de reuniones del condominio. La parte querellante no estuvo presente en la asamblea del 26 de marzo de 2007.

10. El 4 de febrero de 2009, mediante la escritura núm. 4 sobre dación en pago, el Consejo de Titulares del Condominio Amapola

14 transfirió la titularidad del salón de reuniones del condominio a nombre de José Miguel Silverman, su esposa Lourdes Marina Carrasquillo Mercado y la Sociedad Legal de Gananciales compuesta por ambos. Este instrumento público no logró entrada al Registro de la Propiedad.

11. El 22 de noviembre de 2022, la Junta de Directores del Condominio Amapola 14 convocó a los titulares a una asamblea extraordinaria a celebrarse el 29 de noviembre de 2022 para ratificar la constitución del apartamento 103 para uso residencial.

12. La convocatoria del 22 de noviembre de 2022 no fue notificada a la parte querellante.

13. El 29 de noviembre de 2022, se celebró la asamblea extraordinaria en donde se informó que el proceso de venta del salón de reuniones aprobado en el 2009 no se había completado ante el Registro de la Propiedad. A raíz de esta situación, los titulares presentes ratificaron unánimemente la conversión del salón de reuniones a un espacio privado. La parte querellante no estuvo presente en la asamblea del 29 de noviembre de 2022.

14. El 12 de diciembre de 2023, la Junta de Directores del Condominio Amapola 14 le remitió la comunicación a los titulares ausentes a la asamblea extraordinaria del 29 de noviembre de 2023, informando que se extendía un plazo a vencer el 20 de enero de 2023 para notificar las discrepancias con el acuerdo aprobado.

15. El 7 de enero de 2023, la parte querellante remitió carta a la Junta de Directores y al agente administrador, consignando su oposición en cuanto a la venta del salón de reuniones y reclamando la nulidad del proceso por ser contrario a la Ley de Condominios, la vigente y la derogada, y a la escritura matriz del condominio. Adicional, reclamó que el salón de reuniones fuera restaurado a su condición original para que quedase disponible para el uso y aprovechamiento de los titulares del condominio.

16. El 28 de febrero de 2023, la parte querellante, por conducto de su representación legal, suscribió a la Junta de Directores una carta de seguimiento en cuanto a su reclamo del 7 de enero de 2023.

17. El 20 de marzo de 2023, el Consejo de Titulares del Condominio Amapola 14, por conducto de su representación legal, le cursó carta a los abogados de la parte querellante alegando que la enajenación del salón de reuniones había sido aprobada legalmente en la asamblea extraordinaria del 26 de marzo de 2007.

18. El 22 de marzo de 2023, los abogados de la parte querellante solicitaron por escrito a copia de todo documento que apoyara la validez consignada por el Consejo de Titulares en su carta del 20 de marzo de 2023. De igual modo, solicitaron varios documentos bajo la posesión y custodia del Consejo de Titulares y su Junta de Directores.

19. Luego del seguimiento por los abogados de la parte querellante a la solicitud del 22 de marzo de 2023, quedaron pendientes los siguientes documentos:

*El correo certificado que valida la notificación a los titulares del condominio de la asamblea y agenda convocada para su celebración el 26 de marzo de 2007, fecha en que nuestro representado ya era titular y no tiene constancia de haber recibido la notificación.*

*El registro de los titulares a la asamblea del 26 de marzo de 2007 y los que hayan sido representados por proxies y los proxies correspondientes.*

*La carta a los ausentes de la asamblea de 26 de marzo de 2007, ofreciéndoles la oportunidad dentro de los 30 días siguientes a la notificación de discrepar de las decisiones tomadas en esa asamblea de las que se requería la aprobación de mayorías cualificadas o de la unanimidad de los titulares.*

20. Luego de varios trámites, incluyendo la presentación de un recurso ante el foro judicial, el 28 de enero de 2025 la parte querellante radicó ante este Departamento la querella de epígrafe para solicitar como remedio la anulación de los actos del Consejo de Titulares del Condominio Amapola 14 por la venta del salón de reuniones a un tercero, cuyo elemento el régimen de propiedad horizontal les clasifica como de indivisión forzosa, lo que hace nula la transacción que lesione la indivisión. De igual modo, solicitó el cese de toda ocupación material de las partes con interés, José Miguel Silverman, su esposa Lourdes Marina Carrasquillo Mercado y la Sociedad Legal de Gananciales compuesta por ambos y que estos hagan entrega de la posesión física del salón de reuniones al Consejo de Titulares. Adicional, solicitó honorarios, costas y gastos a favor de la parte querellante ante la temeridad de la parte querellada.

21. Radicada la querella ante este Departamento, se celebró una vista sobre el estado de los procedimientos, y tanto la parte querellante como la parte co-querellada, Consejo de Titulares del Condominio Amapola 14, así como la parte co-querellada, Lourdes Marina Carrasquillo Mercado presentaron sendos memorandos de derecho, en apoyo a sus respectivas posiciones respecto a las alegaciones de la parte querellante y solicitando a su favor la resolución sumaria de la querella ante nuestra consideración.

22. La parte querellada se sostiene en que la presente querella esta prescrita por el pasar del tiempo ya que la parte querellante no compareció ni a la asamblea del 26 de marzo de 2007 ni a la asamblea del 29 de noviembre de 2022 y que no tiene prueba para demostrarle a este Departamento que impugnó oportunamente las convocatorias de dichas reuniones y tampoco cuenta prueba para acreditar que sus ausencias estuvieron justificadas.

23. La parte querellante sostiene, más allá de sus alegaciones contenidas en la querella que no existe prescripción como tal toda vez que los actos nulos no producen efecto jurídico alguno y, por ende, no puede transcurrir término alguno de

prescripción contra aquello que inexistente, pues la acción que impugna lo que es nulo *ab initio* no prescribe.

Los recurrentes presentaron recursos en reconsideración, los cuales fueron declarados "No ha lugar" por el DACo.[25]

Inconforme con el proceder de DACO, el 15 de mayo de 2026, la señora Carrasquillo Mercado acudió ante este Tribunal mediante *Auxilio de Jurisdicción* y recurso de *Revisión Judicial,* y señaló los siguientes errores:

A. PRIMER ERROR: Cometió error el DACO y resolvió contrario a derecho al no desestimar la querella y al determinar que "de las alegaciones contenidas en la querella y reiteradas en los escritos que obran en el expediente administrativo, la parte querellante no recibió la convocatoria para la asamblea del 26 de marzo de 2007"; y que "[s]egún las alegaciones en la querella y los escritos que obran en el expediente administrativo, la convocatoria del 22 de noviembre de 2022 no fue notificada a la parte querellante"; sin requerir al querellante cumplir los requisitos de ley para establecer tal hecho, requerirle acreditar justa causa para su ausencia a las asambleas, y sin constatar su legitimación activa para impugnar acuerdos del Consejo de Titulares tomados hace más de una década.

B. SEGUNDO ERROR: Cometió error el DACO al determinar cómo hechos incontrovertidos meras alegaciones de la parte querellante, y emitir remedio sumario basado en esas alegaciones, que no se sustentan con prueba que se encuentre en el expediente administrativo.

C. TERCER ERROR: Cometió error el DACO y resolvió contrario a derecho al determinar mediante resolución sumaria que la querellada debe desalojar su apartamento en sesenta (60) días sin siquiera señalar vista adjudicativa, escuchar y recibir prueba, violentando su debido proceso de ley e interviniendo con su derecho constitucional a no ser despojada arbitrariamente de su propiedad sin un proceso justo y adecuado.

D. CUARTO ERROR: Cometió error el DACO y resolvió contrario a derecho al ordenar el desalojo de la titular compareciente del apartamento 103 del Condominio Amapola 14, del cual es titular hace años, para ordenar convertirlo en salón de reuniones, por determinar que el referido apartamento 103 es un elemento común general y necesario y no un elemento procomunal, y sin considerar

---

[25] Véase, Entrada #19, Apéndice 18 de SUMAC PI; Entrada #20, Apéndice 19 de SUMAC PI; Entrada #21, Apéndice 20 de SUMAC PI.

las cláusulas específicas de la escritura matriz que directamente denominan el apartamento 103 como uno residencial, y apto para ambos usos.

Asimismo, el 18 de mayo de 2026, la Junta de Directores acudió ante este Tribunal mediante *Auxilio de Jurisdicción* y recurso de *Revisión Judicial* y señaló los siguientes errores:

> PRIMER ERROR: Erró DACo al resolver contrario a derecho y no desestimar la querella por falta de legitimación activa, prescripción y determinar que "de las alegaciones contenidas en la querella y reiteradas en los escritos que obran en el expediente administrativo, la parte querellante no recibió la convocatoria para la asamblea del 26 de marzo de 2007"; y que "[s]egún las alegaciones en la querella y los escritos que obran en el expediente administrativo, la convocatoria del 22 de noviembre de 2022 no fue notificada a la parte querellante. Todo lo anterior sin previamente adjudicar la solicitud de desestimación sumaria del Condominio que el propio DACo estableció como parte de los procesos en el caso. Nótese que, el Condominio como parte de su Moción de Desestimación incluyó como sus Anejos la Convocatoria y Acta para las asambleas celebradas el 26 de marzo de 2007 y 22 de noviembre de 2022; ambas notificadas conforme el estado de derecho aplicable en su momento.

> SEGUNDO ERROR: Erró DACo al declarar hechos incontrovertidos meras alegaciones de la parte querellante-recurrida y emitir dictaminar un remedio sumario basado en dichas alegaciones que, no se sustentan con prueba que se encuentre en el expediente administrativo. Con ello emitir una determinación, sumaria, contraria a derecho mediante la cual ordena el desalojo del apartamento 103, en un término de 60 días y revertir su uso y aprovechamiento de todos los titulares del Condominio. Todo lo anterior, sin señalar vista adjudicativa, escuchar y recibir prueba, violentando su debido proceso de ley de las partes coquerelladas recurrentes de auto. Además de imponer el pago de $1,000.00 al Condominio por concepto de temeridad.

> TERCER ERROR: Erró DACo al resolver contrario a derecho y ordenar el desalojo de la coquerellada-recurrente Carrasquillo Mercado del apartamento 103 del Condominio coquerellado-recurrente, del cual es titular hace años, para ordenar convertirlo en salón de reuniones, por determinar que el referido apartamento 103 es un elemento común general y necesario y no un elemento procomunal, y sin considerar las cláusulas específicas de la escritura matriz que directamente denominan el apartamento 103 como uno residencial, y apto para ambos usos.

El 21 de mayo de 2026, declaramos "Ha Lugar" la *Urgente Solicitud de Auxilio de Jurisdicción*, por lo que, ordenamos la paralización inmediata de los procedimientos ante el DACo. Asimismo,

le concedimos a la parte recurrida, quien se allanó a la paralización hasta el 15 de junio de 2026, para presentar su oposición a los recursos de epígrafe. Ese mismo día, el señor González Rivera presentó su oposición a ambos recursos.

**II.**

**A. Revisión Judicial**

La Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico, Ley Núm. 38-2017, 3 LPRA sec. 9601 et seq., (en adelante, LPAU) establece un procedimiento uniforme para la revisión judicial de órdenes y resoluciones dictadas por las agencias administrativas de Puerto Rico. La revisión judicial permite a los tribunales garantizar que las agencias administrativas actúen dentro del marco de las facultades que le fueron delegadas. A través de la revisión judicial, los tribunales pueden constatar que los organismos administrativos cumplan con los mandatos constitucionales que rigen su función y, en especial, con el debido proceso de ley. Su propósito es proveerle a la ciudadanía un foro al cual recurrir para vindicar sus derechos y obtener un remedio frente a las actuaciones arbitrarias de las agencias. La revisión judicial constituye el recurso exclusivo para revisar los méritos de las decisiones administrativas adjudicativas o informales. *Voilí Voilá Corp. et al. v. Mun. Guaynabo*, 213 DPR 743, 753-754 (2024).

En virtud de la LPAU, una parte que haya sido afectada adversamente por una orden o resolución final de una agencia y que haya agotado todos los remedios administrativos disponibles, podrá presentar un recurso de revisión ante el Tribunal de Apelaciones dentro de un término de treinta (30) días, contados a partir de la fecha de archivo en autos de copia de la notificación de la orden o resolución final de la agencia.  Sec. 4.2 de la LPAU, 3 LPRA sec. 9672.

Cabe destacar que, en cuanto al alcance de revisión judicial en las determinaciones administrativas, es la función del foro judicial

asegurarse que los dictámenes de los organismos administrativos se ciñan a sus facultades, conforme la ley que las habilita. Las determinaciones de hechos de las decisiones de estas serán sostenidas por el tribunal, si se basan en evidencia sustancial que obra en el expediente administrativo. Las conclusiones de derecho serán revisables en todos sus aspectos por el tribunal. Al revisar las conclusiones de derecho, el foro judicial considerará el expertise de la agencia en la interpretación de la ley que implanta, pero no estará obligado a guiarse por su criterio como una norma ciega de deferencia automática. Sección 4.5 de la LPAU, 3 LPRA sec. 9675; *Vázquez et al. v. DACo*, 2025 TSPR 56, 216 DPR \_\_\_\_ (2025).

### B. Autoridad de DACo

De ordinario, los tribunales en Puerto Rico poseen jurisdicción general y ostentan autoridad para atender cualquier causa de acción, a menos que no tengan jurisdicción sobre la materia. *Vázquez v. Consejo de Titulares, supra,* pág. 10 (citando a *Rodríguez Rivera v. De León Otaño*, 191 DPR 700 (2014). No obstante, entre las normas de autolimitación judicial se estableció la doctrina de jurisdicción primaria. Esta consiste en determinar si le corresponde al foro judicial o administrativo la facultad para adjudicar y entender un asunto. *Vázquez v. Consejo de Titulares, supra,* pág. 10. Ahora bien, existen dos (2) tipos de jurisdicción primaria, concurrente y la exclusiva. En la concurrente el pleito puede iniciar en la agencia o tribunal; en la exclusiva la ley establece que el foro administrativo será el único que tendrá jurisdicción inicial para atender una reclamación. Íd.

En lo aquí pertinente, la misma Ley de Condominio, supra, le otorgó a DACo jurisdicción primaria exclusiva para atender todo lo relacionado al régimen de Propiedad Horizontal en el que exista por lo menos un apartamento dedicado a vivienda. Art. 66, 31 LPRA sec. 1923j. Por tanto, el DACo tiene jurisdicción primaria exclusiva para atender las acciones u omisiones de la Junta de Directores, del

Administrador Interino, del Agente Administrador, así como los acuerdos del Consejo de Titulares que podrán ser impugnados. Art. 65, 31 LPRA sec. 1923j.

Cabe señalar que la Ley de Condominios, supra, incorporó cambios para facilitar la convivencia en los condominios. La nueva Ley de Condominios entre otras modificaciones estableció, el requisito del consentimiento de dos terceras partes (2/3) de todos los titulares, que a su vez, reúnan dos terceras partes (2/3) de las participaciones en las áreas comunes para las diferentes obras y determinaciones del Consejo de Titulares. De igual forma, mantuvo el requisito de unanimidad para disolver el Régimen de Propiedad Horizontal y para cambiar el uso de un apartamento de uno residencial a uno no residencial y viceversa. [26]En el caso de que la acción de impugnación de acuerdos, acciones u omisiones de la Junta de Directores, del Administrador Interino, del Agente Administrador o del Consejo de Titulares, constituyan violaciones a las disposiciones de esta Ley, de la escritura matriz o del reglamento del condominio, prescribirá a los dos (2) años. El término se computará a partir de la fecha en que se tomó la acción, omisión o acuerdo si fue en la presencia del titular o a partir de la notificación de este si no fue en su presencia. Id.

De hecho, sobre lo anterior DACO se expresó durante la consideración del proyecto número 1874 que dio pie a la Ley de Condominio de Puerto Rico, supra, endosando favorablemente el proyecto. En lo pertinente expresó DACo que el proyecto de ley permite que muchas decisiones para las que era necesaria un voto unánime de los titulares puedan realizarse con el voto de 2/3 partes que a su vez reúnan 2/3 partes del porciento de participación de las áreas comunes. Por ejemplo, la nueva ley facilita el cambio del uso y destino de toda área comprendida en el inmueble, la hipoteca de las áreas comunes,

---

[26] Véase Exposición de Motivos, Ley 129-2020, Ley de Condominios de Puerto Rico, supra.

las enmiendas a la escritura matriz, la conversión y transferencia de elementos comunes, la realización de obras que incidan sobre los elementos comunes, las agregaciones de nuevos pisos y adquisiciones de terrenos colindantes, cambios en la fachada sin importar el número de apartamentos en los condominios, decisiones sobre la reconstrucción de un edificio, y la realización de nuevos pisos y excavaciones. Enfatizando que esto ayudara a que los titulares puedan tomar las decisiones necesarias para modernizar sus propiedades y aumentar su valor.[27]

Por otro lado, en *Pererira Suarez v. Jta. Dir. Cond.*, 182 DPR 485, 508 (2011) el Tribunal Supremo interpretando el Articulo 34 (c) de la Ley 103-2003 [28] y en cuanto a la prescripción de la acción razonó que se encontraba ante una acción anulable, no nula de por sí como serían los casos en los que la Junta de Directores o el Consejo de Titulares realizan un acto que veda la ley. Así expresó que el titular que desee impugnar un acuerdo deberá ser diligente en procurar su derecho. Tendrá la obligación de ejercerlo o reclamarlo dentro del término de dos años que dispone el Art. 42(c), cuando se trate de acuerdos que permita la ley. Para ello es irrelevante si se requiere unanimidad o no. No obstante, distinguió que cuando se trate de cuestionar acuerdos o acciones que la ley prohíbe totalmente no habrá obstáculos prescriptivos para ejercer la impugnación, independientemente del favor de los titulares.

### C. Resolución Sumaria de DACo

La Sección 3.7 de la LPAU, *supra,* establece que, salvo disposición en contrario por su ley orgánica, las entidades administrativas podrán disponer de los asuntos ante su consideración mediante resolución sumaria. 3 LPRA sec. 9647; *OCS v. Universal, 187*

---

[27] Véase Cámara de Representantes, P. de la C. Núm. 1874, 1er Informe Positivo de Comisión rendido don enmiendas, 28 febrero de 2019, págs. 5 a 7.
[28] Hoy derogada, 31 LPRA SEC. 1293f.

*DPR 164,* 177 (2012). Esta procede luego que la agencia determine que no es necesario celebrar una vista adjudicativa.

No obstante, la agencia no podrá dictar órdenes o resoluciones sumarias en los casos en que:

> (1)     estén presentes hechos materiales o esenciales controvertidos;
> (2)     existen alegaciones afirmativas en la querella que no han sido refutadas;
> (3)     surge de los propios documentos que se acompañan con la petición una controversia real sobre algún hecho material y esencial; o
> (4)     como cuestión de derecho no procede la orden de resolución sumaria del proceso. Sección 3.7 de la LPAU, supra, 3 LPRA sec. 9647.

A esos efectos, el DACo, como parte de los poderes conferidos, tiene la facultad de establecer las reglas necesarias para la conducción de los procedimientos administrativos, tanto de reglamentación como para la adjudicación. Art. 6(g) de la Ley Núm. 5-1973 (Ley Orgánica del Departamento de Asuntos del Consumidor), según enmendada, 3 LPRA sec. 341e. Así pues, en cumplimiento con su ley orgánica, el DACo aprobó el Reglamento de Procedimientos Adjudicativos del Departamento de Asuntos del Consumidor, Reglamento Núm. 8034 de 13 de julio de 2011. El referido Reglamento, faculta al DACo resolver órdenes y resoluciones de manera sumaria. Regla 11 del Reglamento de DACo, *supra.*

Es decir, el DACo puede, sin celebrar una vista administrativa, emitir una resolución y ordenar lo que proceda en Derecho. Íd. No obstante, esto únicamente debe ser cuando no surja una controversia real de hechos y luego de que la partes hayan presentado sus planteamientos, y este haber evaluado la evidencia del caso. Íd. De modo que, cuando las partes someten versiones incompatibles entre sí, no es deseable o aconsejable que se resuelva sumariamente. *E.L.A. v. P.M.C.,* 163 DPR 478, 489 (2004). Esto, debido a que difícilmente en tales casos el foro administrativo "puede reunir ante sí toda la verdad de los hechos a través de declaraciones juradas o deposiciones, esto es, controversias en las que el factor credibilidad juega un papel esencial,

si no el decisivo, para llegar a la verdad". Íd.; *Rosario v. Nationwide Mutual*, 158 DPR 775, 779 (2003); *Soto v. Hotel Caribe Hilton*, 137 DPR 294, 301 (1994).

### D. Peso de la prueba

La regla 110 de Evidencia nos ilustra sobre la evaluación y suficiencia de la prueba. Así determina que el juzgador o juzgadora debe evaluar la evidencia presentada con sujeción a ciertos principios, entre ellos: que el peso de la prueba recae sobre la parte que resultaría vencida de no presentarse evidencia por alguna de las partes y la obligación de presentar evidencia primeramente recae sobre la parte que sostiene la afirmativa en el asunto en controversia. 32 LPRA Ap. VI R.110. Es decir que, como norma general, el peso de la prueba lo lleva la parte que resultaría vencida si no presenta prueba a su favor. De esa manera, el que busca un remedio en el ámbito administrativo, al igual que en el judicial, tiene que probar su caso. "Es decir, tiene que evidenciar con prueba suficiente en derecho que sus alegaciones no constituyen meros señalamientos, sino un reclamo cierto y sostenible". *OEG v. Martínez Giraud*, 210 DPR 79, 97 (2022).

### E. Ley de Condominios 1958-2003: Elementos Comunes

Las fuentes rectoras principales del Régimen de Propiedad Horizontal van en el siguiente orden: (1) Ley de Condominios; (2) el Reglamento de DACO sobre los Condominios; (3) la escritura matriz; (4) el reglamento del Condominio; (5) los acuerdos del Consejo de Titulares [...]. M.J. Godreau, *El Condominio: El régimen de la propiedad horizontal en Puerto Rico*, San Juan, Ed. Situm, 2019, pág. 111. El Régimen de Propiedad Horizontal por su concurrencia con varias propiedades individuales bajo una misma estructura, requiere la existencia de una serie de espacios, áreas, estructuras e instalaciones necesarias para el uso común. M.J. Godreau, *op. cit.,* pág. 139. En otras palabras, lo característico de la propiedad horizontal es la coexistencia de propiedad privada y propiedad comunal sobre diferentes partes de la edificación.

M. García Cárdenas, *Propiedad Horizontal Ley de Condominio 2020*, Puerto Rico, MJ Editores, 2023, pág. 21.

La derogada Ley Núm. 104 del 25 de junio de 1958, es la primera disposición que formalmente nombró el Régimen de Propiedad Horizontal. No obstante, antes de su existencia, el Código Civil ya proveía disposiciones que regían a este tipo de propiedad. M.J. Godreau, *op. cit.,* págs. 113. En lo pertinente a la controversia que nos ocupa, el Artículo 11 de la Ley Núm. 104-1958 disponía sobre los elementos comunes:

(a) El terreno en que se asiente el edificio.
(b) Los cimientos, paredes maestras, techos, galerías, vestíbulos, escaleras y vías de entrada y salida o de comunicación.
(c) Los sótanos, azoteas, patios y jardines, salvo disposición o estipulación en contrario.
(d) Los locales destinados a alojamiento de porteros o encargados del edificio, salvo disposición o estipulación en contrario.
(e) Los locales e instalaciones de servicios centrales, como electricidad, luz, gas, agua fría y caliente, refrigeración, cisternas, tanques y bombas de aguas y demás similares.
(f) Los ascensores, incineradores de residuos y, en general, todos los artefactos o instalaciones existentes para beneficio común.
(g) Toda área destina a estacionamiento, salvo disposición o estipulación en contrario.
(h) Todo lo demás que fuere racionalmente de uso común del edificio necesario para su existencia, conservación y seguridad.

Asimismo, el Artículo 12 consideraba como elementos comunes pero limitados los pasillos, escaleras, ascensores especiales, servicios sanitarios comunes a los apartamientos de un mismo piso y otros análogos. Art. 12 de la Ley Núm. 104-1958. Ahora bien, estos elementos comunes, generales y limitados debían permanecer en indivisión forzosa, y cualquier pacto en contrario sería nulo. Art. 13 de la Ley Núm. 104-1958.

Así las cosas, la Ley Núm. 104-1958 se enmendó mediante la Ley Núm. 157 del 4 de junio de 1976. "Las enmiendas fueron sustanciales y su propósito fue atender los problemas más frecuentes que se habían

suscitado a lo largo de casi dos décadas de vigencia de la legislación original". M.J. Godreau, *op. cit.,* pág. 114. En cuanto a los elementos comunes, la Ley Núm. 157-1976 no utilizaba la terminología de "necesarios" o "voluntarios", sino todos estaban enumerados bajo "elementos comunes generales". Íd., pág. 139.

Posteriormente, en el año 2003 se creó la Ley Núm. 103 del 5 de abril de 2003 (Ley Núm. 103-2003) con el fin de, entre otros, actualizarla a la realidad social de la época. En *Consejo de Titulares v. Hospitality,* 168 DPR 101 (2006), el Tribunal Supremo le reconoció el efecto retroactivo a la Ley Núm. 103-2003, en virtud de que la misma ley en su Artículo 44 disponía que "…sus disposiciones regirán a todo inmueble sometido al régimen de Propiedad Horizontal, cualquiera que sea el momento en que fuera sometido a dicho régimen". M.J. Godreau, *op. cit.,* pág. 112.

De otra parte, el Artículo 2 de la Ley Núm. 103-2003 disponía que la escritura que establezca el régimen de propiedad horizontal expresará clara y precisamente el destino y uso de toda área comprendida en el inmueble. Ahora bien, en lo pertinente a la controversia que nos ocupa, el Artículo 11 de la aludida ley establecía cuáles serían los <u>elementos comunes generales necesarios,</u> no susceptibles de propiedad individual por los titulares y, por tanto, sujetos a un régimen de indivisión forzosa:

> (1) El vuelo, entendido éste como el derecho a sobre elevar. Excepto lo dispuesto en el Artículo 14-A, el cierre o techado de patios, terrazas o áreas abiertas, así como la construcción de nuevos pisos sobre el techo y sobre o debajo del terreno requerirá, siempre que tales obras no estén contempladas en los planos sometidos con la escritura de constitución de régimen, el consentimiento unánime de los titulares.

> (2) Los cimientos, paredes maestras y de carga, techos, galeras, escaleras y vías de entrada y salida o de comunicación.

> (3) Los locales para instalaciones de servicios centrales, como electricidad, luz, gas, agua fría y caliente, refrigeración, cisternas, tanques y bombas de agua, y demás similares que sean indispensables para el adecuado disfrute de los apartamientos, salvaguardando que estos elementos no se ubiquen dentro de los apartamientos o locales privados.

(4) Los ascensores, cuando éstos sean necesarios para el adecuado disfrute de los apartamientos.

(5) Las áreas verdes y los árboles requeridos por las instrumentalidades o dependencias del Estado Libre Asociado de Puerto Rico.

(6) Cualquier otro elemento que fuere indispensable para el adecuado disfrute de los apartamientos en el inmueble. Art. 11(a) de Ley Núm. 103-2003.

Al considerarse tales elementos comunes generales necesarios, cualquier pacto que transfiera la titularidad, posesión o control distinta a la del Consejo de Titulares será nulo. Art. 11(a) de la Ley Núm. 103-2003. Sobre la antes citada lista, el Tribunal Supremo expresó que por su inciso (6) se trata de una disposición "numerus apertus", por lo que, se puede pactar o reconocer otros elementos comunes no considerados por ley. *Cestero Aguilar v. Jta. Dir. Condominio,* 184 DPR 1, 14-15 (2011); *Brown III v. J.D. Cond. Playa Grande,* 154 DPR 225 (2001). Ahora bien, los elementos comunes necesarios son aquellos que "*sin los cuales resultaría inasequible el adecuado disfrute de los apartamentos". Cestero Aguilar v. Jta. Dir. Condominio, supra,* pág. 12. De manera que, "incluye aquellos necesarios para lograr la seguridad, conservación o existencia del edificio". Íd. *Brown III v. J.D. Cond. Playa Grande, supra,* pág. 233; *Arce v. Caribbean Home Const. Corp.,* 108 DPR 225 (1978).

De otra parte, la misma ley en su Artículo 11(b) dispone cuáles son los elementos comunes generales (voluntarios):

(1) El terreno, los sótanos, azoteas, patios y jardines.

(2) Los locales destinados a alojamiento de porteros o encargados.

(3) Las áreas destinadas a estacionamiento.

(4) Las áreas recreativas que excedan lo requerido por la reglamentación urbana o por las autoridades competentes. Art. 11(b) de la Ley Núm. 103-2003.

Para adjudicar los elementos comunes generales antes enumerados, se requerirá el consentimiento unánime de los titulares. Art. 11(b) de la Ley Núm. 103-2003. La transferencia deberá inscribirse

en el Registro de la Propiedad, con el fin de dejar constancia de los nuevos porcentajes de participación para cada uno de los apartamentos. Íd. Ahora bien, aun cuando estos son susceptibles de aprovechamiento independiente, no podría enajenarse como áreas privadas, sino para el beneficio del Consejo de Titulares o de uno o varios titulares de apartamientos. Íd. Es decir, estos no gozan del carácter de indispensable, por lo que pueden ser transferidos a propiedad privada, siempre y cuando conste en la escritura matriz del régimen o se haya adoptado mediante acuerdo unánime de todos los propietarios. *Cestero Aguilar v. Jta. Dir. Condominio, supra,* pág. 18.

De lo anterior, los elementos comunes se clasifican en elementos comunes necesarios y voluntarios. *Bravman, González v. Consejo Titulares,* 183 DPR 827, 848 (2011). "La razón para ello estriba en que no todas las partes de uso común tienen el mismo valor o importancia en el papel que desempeñan". Íd. Según reseñamos, los elementos comunes necesarios no son susceptibles de propiedad individual por los titulares y están sujetos a un régimen de indivisión forzosa. Mientras que los elementos comunes voluntarios pueden quedar sometidos a lo que dispongan todos los integrantes del régimen. Íd., pág. 849; *Brown III v. J.D. Cond. Playa Grande,* 154 DPR 225, 237 (2001); *Arce v. Caribbean Const. Corp., supra.* "Siendo ello así, se permite la transformación de un elemento común en privado con el consentimiento unánime de los titulares". *Bravman, González v. Consejo Titulares, supra,* pág. 849. De modo que, la adquisición del elemento común general siempre estará atada al destino y uso dispuesto en la escritura matriz, el cual exclusivamente puede ser alterado en respuesta a la unanimidad de todos los integrantes del sistema.

Según el Prof. Michael Godreau, la clasificación de elementos comunes necesarios y voluntarios es de suma importancia, porque sólo los voluntarios pueden enajenarse, mientras que los

necesarios, aun con el consentimiento unánime de los titulares no se pueden enajenar. M.J. Godreau, *op. cit.,* pág. 140. La escritura matriz es donde se especifica qué áreas son comunes generales necesarios, así como las limitadas y privadas. M. García Cárdenas, *op. cit.,* pág. 22.

En *Cestero Aguilar v. Jta. Dir. Condominio, supra,* la controversia giraba en torno si la conservación, la reparación y el mantenimiento de las barandas de los balcones de un condominio recae en la Junta de Directores del Condominio o en los titulares. El Tribunal Supremo resolvió que la baranda de los balcones es un elemento común necesario que conforma parte del conjunto arquitectónico denominado "fachada". Nuestro más alto foro local explicó que, la naturaleza común necesaria de las barandas del balcón implicaba que estas se debían mantener siempre en indivisión forzosa. Íd., pág. 19.

Similarmente, en *Junta Dir. Cond. Montebello v. Torres*, 138 DPR 150 (1995), el Tribunal Supremo resolvió que la fachada de un edificio constituía un elemento común necesario. En específico, concluyó que "tanto la fachada como las demás paredes perimetrales de un edificio son consideradas como bienes de uso común por ser racionalmente necesarias para la 'existencia, conservación, seguridad y adecuado uso y disfrute' del inmueble". Íd., pág. 155.

En *Consejo de Titulares Cond. Parkside v. MGIC,* 128 DPR 538 (1991), se suscita la controversia debido a la incongruencia entre la escritura matriz y los planos del edificio con relación a la descripción de ciertas áreas de la primera planta. En esencia, las áreas ubicadas en la primera planta aparecían descritas en la escritura matriz como "servicios vecinales", una categoría que no aparecía expresamente en el Artículo 11 como elemento común. No obstante, en el plano del edificio las mismas áreas se catalogaron como "recreativas". De este caso, el Prof. Godreau argumenta que el análisis del tribunal se debió limitar a si medió o no el cambio, el uso o destino del área en controversia, conforme a lo dispuesto clasificación de la escritura matriz en el sentido

de que las áreas en cuestión eran para "servicios vecinales", entonces el consentimiento unánime de los titulares podría transformarlas de elementos voluntarios a fincas privativas. Íd., M.J. Godreau, *op. cit.,* págs. 142-143.

### III.

En esencia, los recurrentes alegan que el DACo incidió al emitir remedio sumario basado en las alegaciones del recurrido, las cuales no fueron sustentadas con prueba que se encuentre en el expediente administrativo. Asimismo, sostienen que erró el DACo al determinar mediante resolución sumaria que la señora Carrasquillo Mercado debe desalojar su apartamento en sesenta (60) días sin siquiera señalar vista adjudicativa, escuchar y recibir prueba, violentando su debido proceso de ley e interviniendo con su derecho constitucional a no ser despojada arbitrariamente de su propiedad sin un proceso justo y adecuado. Además, aducen que la determinación del DACo es errónea al determinar que el Apartamento 103 es un elemento común general y necesario, sin considerar las cláusulas específicas de la escritura matriz que directamente denominan el Apartamento 103 como uno residencial, y apto para ambos usos.

Por estar estrechamente relacionados, discutiremos los errores señalados en conjunto.

A fines de ilustrar la controversia ante nos, hacemos un breve resumen de los hechos del caso de autos. Este tiene su génesis con la presentación de la Escritura Matriz Número 173 que dio vida al Condominio en el Registro de la Propiedad en el año 1974.[29] El señor González Rivera advino titular del Apartamento 202 ubicado en el Condominio Amapola 14 mediante Escritura de Compraventa Número 231 de 31 de diciembre de 2002.[30]

---

[29] Entrada #1, Anejo 1, del SUMAC PI, págs. 38-196.
[30] Íd., Anejo 2, págs. 186-196.

Surge del expediente que, el 1 de marzo de 2007, la Junta de Directores circuló un memorial a los titulares, en cual se informó la posibilidad de aprobar la venta del salón de reuniones, con el fin de cubrir los costos para obras de reparación y mantenimiento.[31] Esto, dado a que, el edificio cumplía 32 años de ser construido y por estar frente al mar, sufrió de varias averías y deterioro que son normales por su ubicación.[32] Además, el Condominio contaba con serias averías estructurales que ponían en peligro la solidez estructural del edificio si no se atendían prontamente.[33] Luego de un estudio minucioso de los defectos de todo el edificio, se identificó dos formas viables para costear los arreglos: (1) llevar a cabo una derrama de un total aproximado de $385,000; (2) vender el Apartamento #103.[34] Sobre ese apartamento, expresaron que "ha estado alquilado, de tiempo en tiempo, por $800 mensuales".[35]

Así las cosas, el 15 de marzo de 2007, la Junta de Directores convocó una asamblea extraordinaria para el 26 de marzo de 2007, con el fin de atender, entre otros asuntos, la aprobación de la venta del salón de reuniones.[36] Consta de la minuta de la referida asamblea, que esta se convocó a mediante correo certificado a cada uno de los titulares.[37] Además, surge que aprobó por unanimidad la siguiente moción: "Que se venda o se permute el Apartamento [103] para hacer arreglo estructural y pintura del edificio siempre qu[e] el valor sea el mismo".[38] De esta asamblea, el apelante alega que no fue notificado.

Así las cosas, el 4 de febrero de 2009, y según fue establecido por DACo en la determinación de hecho número 10 de la Resolución Sumaria se otorgó la Escritura Número 4 de Dación en Pago por el Lcdo.

---

[31] Íd., Anejo 6, págs. 206-208.
[32] Íd., pág. 206
[33] Íd.
[34] Íd., pág. 207.
[35] Íd.
[36] Íd., Anejo 7, págs. 209-210.
[37] Íd., Anejo 8, págs. 212-213.
[38] Íd., Anejo 8, pág. 213.

Villanueva con la intención de transferir el título del salón de reuniones a nombre de José Miguel Silverman, presidente de Silverman Painting, a su esposa Lourdes Marina Carrasquillo Mercado, y la Sociedad Legal de Gananciales compuesta por ambos. Luego, el 10 de noviembre de 2022, se convocó una asamblea extraordinaria a celebrarse el 29 de noviembre de 2022, la que incluyó como tema la "Constitución Apartamento 103 y Estacionamiento #2".[39] En esa asamblea, se consignó que se requería el voto unánime de los titulares por lo que tenían que notificar a los ausentes de la reunión.[40] Además, se indicó que el proceso de venta del salón de reuniones aprobado en el 2009 no se completó ante el Registro de la Propiedad, por lo que se requería ratificar el convertir el apartamento 103 y el estacionamiento 2-A de comunal a privativo.[41] Según el recurrido, este nunca fue notificado de dicha asamblea.

El 12 de diciembre de 2023, la Junta de Directores alega haber remitido comunicación a los ausentes a dicha asamblea extraordinaria, en la cual se informó que se extendía un plazo a vencer el 20 de enero de 2023 para notificar las discrepancias con el acuerdo aprobado.[42] El 7 de enero de 2023, el señor González Rivera remitió una carta a la Junta de Directores y el agente administrador, en la cual indicó que todo lo actuado en el 2009 sobre el apartamento 103 es nulo desde su inicio.[43]

Según vimos, el DACo emitió una *Resolución Sumaria* mediante la cual determinó que los actos sobre constituir el apartamento 103 como uno privativo son nulos *ab initio*.[44] Explicó que, en la escritura matriz quedó establecido que el salón de reuniones es un elemento común general necesario. Por tanto, quedó plasmado el carácter de

---

[39] Íd., Anejo 9, págs. 214-215.
[40] Íd., Anejo 10, págs. 216-219.
[41] Íd., págs. 217-218.
[42] Íd., Anejo 11, pág. 220
[43] Íd., Anejo 12, págs. 221-222.
[44] Entrada #18, Apéndice 17 de SUMAC PI.

indivisibilidad forzosa de todos los elementos comunes del condominio, por lo que no podrán destinarse a otro uso que no sea el asignado en su origen. En adición, sostuvo que, la cláusula QUINTA dispone que los elementos comunes y/o restringidos permanecerán indivisos y no serán objeto de una acción para la división de la copropiedad. A esos efectos, en la escritura matriz no se creó ni nunca quedó constituido el salón de reuniones como un apartamento para uso privado, como el resto de los apartamentos en el Condominio Amapola 14.

Ante ello, veamos las cláusulas en que el DACo basó su decisión y de las que el recurrido asegura que el salón de reuniones (*meeting room)* se trata de un elemento común necesario:

La escritura matriz del Condominio Amapola 14, en su Cláusula TERCERA dispone lo siguiente:

> That the said project consists of a Basement, a Lobby Floor and Twelve Upper Floors, each comprising five individual and residential apartments, except the first floor which contains four residential apartments and one meeting room. **The twelve floors above the lobby floor are all capable of individual utilization** on account of having their own exit to a common and/or restricted area of the project. **Each apartment (hereinafter called a "family unit") and the owner thereof will obtain a particular and exclusive property right to the family unit and shall also acquire an undivided interest in the general and/or restricted common areas and facilities of the project, as listed herein after in this deed, necessary for the adequate use and enjoyment of the family unit**, all in accordance with the Horizontal Property Act of Puerto Rico, Act Number One Hundred Four (104) of June twenty five, nineteen hundred fifty eight, as amended. (Énfasis nuestro).[45]

Asimismo, la Cláusula QUINTA, inciso (2), sub inciso (b), dispone lo siguiente:

> FIFTH: That the family units and common areas and/or restricted facilities of the project will be as follows:
> [...]
> **General Common Areas and/or Restricted facilities of the Property**. **The general common elements and/or restricted facilities of the property** which is the subject of this deed, known as AMAPOLA 14 CONDOMINIUM are as follows:
> (a) [...].
> (b) In general, the foundation, main or bearing walls, roofs, halls, lobby, **meeting room**, stairways and the entrances and exits to the building.
> [...]
> **All of the common elements and/or restricted facilities shall remain undivided and shall not be the subject of an action for division of the co-ownership.** Furthermore,

---

[45] Íd., Anejo 1, págs. 42-43.

each co-owner may use the elements used in common in accordance with the purpose for which they are intended, without hindering or encroaching up on the lawful rights of the co-owners. (Énfasis nuestro).[46]

Por último, la cláusula VEINTISEIS establece lo siguiente:

The measures of the family units include all of the outside block partition walls and one half of the interior partitions but excluding bearing walls. Each and every one of the Apartments are hereinafter described as follows:
[...]
**APARTMENT ONE HUNDRED THREE (103) Also known as MEETING ROOM**: HORIZONTAL PROPERTY-URBAN: Residential Apartment in regular shape on the First Floor of Amapola 14 Condominium, located at Cangrejo Arriba Ward of the Municipality of Carolina, Puerto Rico. Said meeting room has an area of approximately Five Hundred Eighty Six point Five One Feet (586.51 Ft) equivalent to Fifty Four point Fifty One Square Meters (54.51 sq. mts.) and its boundaries are as follows: at the West, a block wall of twenty five point five eight feet (25.58 ft.) equivalent to seven point eighty meters (7.80 mts.) consisting of the Western boundary of the meeting room, walk-in-closet, and bathroom wall; at the North, in twenty one point eighty three feet (21.83ft.) equivalent to six point six five meters (6.65 mts.) consisting of a terrace and window wall overlooking the ocean; on the East, a block wall of twenty eight point eighty three feet (28.83_ft.) equivalent to eight point seven nine meters (8.79 mts.) consisting of the eastern boundary of the terrace and meeting room; and at the South, in twenty one point eighty three feet (21.83 ft.) equivalent to six point six five meters (6.65 mts.) consisting of the southern boundary of the meeting room, the meeting room entrance.
This Apartment or Meeting Room comprises: Front Covered Terrace and Comunal [sic] area for the meeting room. (Énfasis nuestro).[47]

Según las cláusulas reseñadas, podemos concluir que la escritura matriz clasifica el salón de reuniones (*meeting room*) como un elemento "necesario para el adecuado uso y disfrute de la unidad familiar" y como tal, no podrá ser objeto de división. (Traducción suplida).[48] No obstante, recordemos que la Escritura Matriz se redactó en el año 1974, cuando todavía la ley no diferenciaba entre elementos comunes generales y los necesarios, así tampoco permitía adjudicar u enajenar este tipo de elemento, salvo en algunos casos mediante disposición o estipulación en contrario. En particular, el Artículo 11 de la Ley Núm. 104-1958 disponía sobre los elementos comunes:

(a) El terreno en que se asiente el edificio.

---

[46] Íd., págs. 43-50.
[47] Íd., págs. 85-86.
[48] Íd., págs. 42-43.

(b) Los cimientos, paredes maestras, techos, galerías, vestíbulos, escaleras y vías de entrada y salida o de comunicación.

(c) Los sótanos, azoteas, patios y jardines, salvo disposición o estipulación en contrario.

(d) Los locales destinados a alojamiento de porteros o encargados del edificio, salvo disposición o estipulación en contrario.

(e) Los locales e instalaciones de servicios centrales, como electricidad, luz, gas, agua fría y caliente, refrigeración, cisternas, tanques y bombas de agua y demás similares.

(f) Los ascensores, incineradores de residuos y, en general, todos los artefactos o instalaciones existentes para beneficio común.

(g) Toda área destina a estacionamiento, salvo disposición o estipulación en contrario.

**(h) Todo lo demás que fuere racionalmente de uso común del edificio necesario para su existencia, conservación y seguridad.** (Énfasis nuestro).

De lo anterior, vemos que no existe un inciso específico sobre una sala de reuniones (*meeting room)*. Por tanto, si nos posicionamos en el momento que se redactó la escritura matriz, debemos entender que debe estar incluido como un elemento común del inciso (h), a saber: aquel que "fuere racionalmente de uso común del edificio necesario para su existencia, conservación y seguridad". Artículo 11(h) de la Ley Núm. 104-1958. Esto, dado a que, este inciso buscaba incluir todo lo demás que no se encuentra en los otros incisos y que racionalmente fuese necesario.

Más tarde, cuando se estableció mediante una alegada unanimidad el adjudicar en dación en pago el salón de reuniones con el fin de reparar las averías del Condominio, se encontraba vigente la Ley Núm. 103-2003. En cuanto a los elementos necesarios, en teoría la Ley Núm. 103-2003 lo que hizo fue enmendar para añadir y mover algunos elementos de la lista contenida en el Artículo 11 de la Ley Núm. 104-1958.[49] Ciertamente, esta no incluyó de manera específica un

---

[49] El Artículo 11(a) de la Ley Núm. 103-2003 dispone que los elementos comunes necesarios son:

(1) El vuelo, entendido éste como el derecho a sobre elevar. Excepto lo dispuesto en el Artículo 14-A, el cierre o techado de patios, terrazas o áreas abiertas, así como la construcción de nuevos pisos sobre el techo y sobre o debajo del terreno requerirá, siempre que tales obras no estén

"salón de reuniones" y su cláusula "residual" fue cambiada a "[c]ualquier otro elemento que fuere indispensable para el adecuado disfrute de los apartamientos en el inmueble". Art. 11(a)(6) de la Ley Núm. 103-2003. Además, la misma ley reafirmó que tales elementos comunes necesarios no susceptibles de propiedad individual por los titulares y sujetos a un régimen de indivisión forzosa, por tanto, cualquier pacto en contrario sería nulo. Art. 11(a) de la Ley Núm. 103-2003.

Ahora bien, el Artículo 11, en su inciso b, de la misma ley, dispuso cuáles son los <u>elementos comunes generales</u> (voluntarios): (1) el terreno, los sótanos, azoteas, patios y jardines; (2) Los locales destinados a alojamiento de porteros o encargados; (3) las áreas destinadas a estacionamiento; (4) las áreas recreativas que excedan lo requerido por la reglamentación urbana o por las autoridades competentes. Ley Núm. 103-2003. Además, añadió que, para adjudicar los elementos comunes generales antes enumerados, se requerirá el consentimiento unánime de los titulares. Art. 11(b) de la Ley Núm. 103-2003.

Recapitulamos que, los elementos comunes se clasifican en elementos comunes necesarios y los voluntarios. *Bravman, González v. Consejo Titulares, supra,* pág. 848. "La razón para ello estriba en que

---

contempladas en los planos sometidos con la escritura de constitución de régimen, el consentimiento unánime de los titulares.

(2) Los cimientos, paredes maestras y de carga, techos, galerías, escaleras y vías de entrada y salida o de comunicación.

(3) Los locales para instalaciones de servicios centrales, como electricidad, luz, gas, agua fría y caliente, refrigeración, cisternas, tanques y bombas de agua, y demás similares que sean indispensables para el adecuado disfrute de los apartamientos, salvaguardando que estos elementos no se ubiquen dentro de los apartamientos o locales privados.

(4) Los ascensores, cuando éstos sean necesarios para el adecuado disfrute de los apartamientos.

(5) Las áreas verdes y los árboles requeridos por las instrumentalidades o dependencias del Estado Libre Asociado de Puerto Rico.

(6) Cualquier otro elemento que fuere indispensable para el adecuado disfrute de los apartamientos en el inmueble. Art. 11(a) de Ley Núm. 103-2003.

no todas las partes de uso común tienen el mismo valor o importancia en el papel que desempeñan". Íd. Los elementos comunes necesarios son aquellos que "*sin los cuales resultaría inasequible el adecuado disfrute de los apartamentos". Cestero Aguilar v. Jta. Dir. Condominio, supra,* pág. 12. Los voluntarios no gozan del carácter de indispensable, por lo que, pueden ser transferidos a propiedad privada, siempre y cuando conste en la escritura matriz del régimen o se haya adoptado mediante acuerdo unánime de todos los propietarios. *Cestero Aguilar v. Jta. Dir. Condominio, supra,* pág. 18.

De todo lo anterior, si vemos la lista de los elementos comunes necesarios y voluntarios la cual fue introducida por primera vez mediante la Ley Núm. 103-2003, esta nos revela que el salón de reuniones no es un elemento común necesario. Pese a que, el recurrido con el fin de extrapolar que debido a que la Escritura Matriz dispone que el salón de reuniones es elemento "necesario para el adecuado uso y disfrute de la unidad familiar" y como tal, "no podrá ser objeto de división", esto no quiere decir que es el mismo "elemento común necesario" que la Ley Núm. 103-2003 busca proteger.

Si examinamos los elementos comunes necesarios del Artículo 11(a) de la Ley Núm. 103-2003 podemos notar que sin ellos resultaría incompatible con el buen funcionamiento del condominio, como lo son: los ascensores, instalaciones de servicios centrales, como electricidad, luz, gas, agua, los cimientos, paredes maestras y de carga, techos, galerías, escaleras, vías de entrada y salida, o de comunicación, y entre otras cosas. Mientras que los elementos comunes voluntarios no tienen ese nivel de necesidad. Véase, Artículo 11(b) de la Ley Núm. 103-2003. Por lo tanto, somos de la opinión, que el salón de reuniones por su naturaleza prescindible debe ser catalogado como un elemento común voluntario y no como un elemento común necesario sujeto a un régimen de indivisión forzosa.

Nuestra decisión está aún más sustentada con el hecho, que, desde antes del año 2009, fecha en que se otorgó la escritura de Dación en Pago a favor de José Miguel Silverman y la señora Carrasquillo Mercado, el salón de reuniones se rentaba como residencia.[50] Es más, de la misma *Querella* del recurrido surge que este se alquilaba para uso residencial desde el año 1983.[51] Es decir, que por más de 40 años se ha utilizado el salón de reuniones como un apartamento residencial. Es decir, este nunca se ha utilizado con el fin que la Escritura Matriz le otorgó, y tal acto no ha impedido el adecuado disfrute de los apartamentos. Así como tampoco, en todos estos años, el salón de reuniones ha demostrado ser un elemento necesario para la existencia, conservación y seguridad del edificio. Siendo ello así, resolvemos que este no es y nunca ha sido un elemento común necesario.

Además, entendemos que fue adjudicado conforme a derecho, ya que según surge del expediente este se dio mediante el consentimiento unánime de los titulares que requiere el Art. 11(b) de la Ley Núm. 103-2003. Así pues, no puede ser considerado como un acto nulo incapaz de ser sujeto a prescripción. Así pues, la acción está más que prescrita, dado a que, este tenía 2 años para impugnarla desde que se adjudicó en dación de pago el salón de reuniones en el año 2007. Véase, Art. 65 de Ley de Condominios del 2020, 31 LPRA sec. 1923j.

Ahora bien, en cuanto a la asamblea del 29 de noviembre de 2022, el recurrido tiene legitimación para impugnarla por haber hecho su reclamación a tiempo. No obstante, limitado a lo allí celebrado. Conviene mencionar que, entendemos que existe controversia si el recurrido fue notificado a esa asamblea, lo cual impide que el DACo resuelva de manera sumaria. Según vimos, cuando las partes someten versiones incompatibles entre sí, no es deseable o aconsejable que se resuelva sumariamente. *E.L.A. v. P.M.C., supra,* pág. 489. Igualmente,

---

[50] Íd., Anejo 6, pág. 207.
[51] Entrada #1, "Documento Principal", pág. 9.

recordemos que, en materia de prueba, quien busca un remedio o una sanción en el ámbito administrativo, al igual que en el judicial, tiene que probar su caso. "Es decir, tiene que evidenciar con prueba suficiente en derecho que sus alegaciones no constituyen meros señalamientos, sino un reclamo cierto y sostenible". *OEG v. Martínez Giraud, supra,* pág. 93. Ahora bien, es deber de la Junta de Directores facilitar la prueba que solo en sus manos puede estar, aun si resultase perjudicial a su defensa.

En vista de lo anterior, resolvemos que la adjudicación del salón de reuniones se hizo conforme a derecho. Lo que resta es determinar si el recurrido asistió a la asamblea del 29 de noviembre de 2022 a los fines de poder impugnarla. De modo que, ordenamos al DACo celebrar una vista en sintonía con lo aquí resuelto.

**IV.**

Por las razones que anteceden, revocamos la *Resolución* recurrida.

Notifíquese.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones